S. A. GATLIN v. THE STATE.

No. 12207. Delivered March 20, 1929.
Rehearing denied October 9, 1929.

248

The opinion states the case.

*Taylor, Muse* and *Taylor* of Wichita Falls, for appellant.

*A. A. Dawson* of Canton, State's Attorney, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, fifteen years in the penitentiary.

Appellant killed his son-in-law whose wife, a fifteen year old girl, testified that the day before the killing she had told appellant of the fact that she was pregnant by deceased before they married, and that since they married he had mistreated her. Her mother was also a witness for appellant. The day following the conversation above referred to appellant shot and killed deceased while in his place of business. Appellant claimed the killing was in self-defense. State witnesses testified that deceased was at work in a tailor shop when appellant entered; that he arose and greeted appellant, and walked toward him with his hands out and nothing in them, and that he made no hostile motion. One bullet entered the front of the body of deceased and three entered from the back. According to the State's testimony, when the first shot was fired deceased fell and rolled under a table, and the other three shots were fired after he was down.

We discuss the complaints of procedure in the order same are briefed by appellant. Bonnie Miles, wife of deceased and daughter of appellant, was a very material defense witness, her testimony furnishing a motive for the killing, which might satisfy the jury that same was not with malice aforethought. Her attitude toward deceased and the killing was a proper subject of inquiry. The State asked her if her husband did not have a $3,000.00 insurance policy at the time of his death, payable to her, which she had collected since. This was objected to and the point saved in a bill of excep-

tions. She admitted this to be a fact. As a general proposition, any testimony supporting the theory of an improper motive which might affect the mind of a witness is never regarded as immaterial or collateral. Green v. State, 53 Texas Crim. Rep. 473; Bennett v. State, 28 Texas Crim. App. 540. See Sec. 163, Branch's Annotated P. C. for collation of authorities. This witness had financially benefited by the slaying of her husband by appellant. We are not prepared to say that the jury might not fairly infer from such proof a bias on the part of the witness which might affect her testimony. Another bill complains of the asking of the mother of said witness if she knew of such insurance policy before the homicide, but the answer being in the negative, we would in any event hold the bill to show no injury.

We find in the charge of the court no sort of limitation of the appellant's right of self-defense, and in such case we uniformly hold it not error to refuse to charge on his right to arm himself and seek an explanation. The bills of exception complaining of the refusal of special charges seeking to have the jury told that appellant had the right to arm himself, etc., shows no error. Authorities in point are Williford v. State, 38 Texas Crim. Rep. 396, and cases cited in Sec. 1950, Branch's Annotated P. C.

Special charge No. 6 sought to have the jury told that if deceased had made vulgar or insulting remarks to or about the daughter of appellant, or if he had committed acts of violence upon her, and such facts were known to appellant, and thereafter he went to where deceased was and when he saw him there was aroused in his mind sudden passion, etc., such as rendered it incapable of cool reflection, and while in such state of mind he shot and killed deceased, then such fact should be considered by the jury in determining the amount of punishment. Such charge was manifestly on the weight of testimony, and sought to have the court instruct the jury that the sight of deceased might create sudden passion, etc., on the part of appellant. We have no disposition to attempt by any opinion to bring back into the body of our law the elements of manslaughter which have been eliminated by the new murder statute. Appellant made no claim that he shot deceased because of any vulgar or insulting conduct. Under our present murder statute it is the duty of the court to admit in testimony all facts showing the relations of the parties and mental status of the defendant, and he is then to give the jury a correct instruction on malice aforethought, and to tell them that if they believe the homi-

cide to have been with malice aforethought, the punishment shall be as stated; and if the homicide be without malice aforethought, it shall also be otherwise as stated.

Five special charges were asked and given instructing the jury not to consider certain matters of argument made by the representatives of the State. It is here urged that the error of such argument could not be thus cured. We have considered each of the bills presenting these complaints and believe none of them present argument capable of any injury to appellant. As illustrative, we give what is apparently the most injurious of these. The district attorney said: "Thirteen years ago the defendant had to give up his wife and baby because he could not live with his wife." The record elsewhere reflects that at about the time mentioned appellant and his wife were divorced, she taking the child mentioned. The remark of the district attorney would seem more reflective on the wife, and, as stated, of no possible injury to appellant.

We find bills of exception complaining of the refusal of seven special charges, relative to argument. Each bill is in form the same, in that each sets out the charge requested, and further that same was asked because there was no testimony supporting such argument, and same was prejudicial. There is no showing or certificate in any of said bills that the argument was in fact made, or that when made it was then objected to and an exception taken. Blackwell v. State, 107 Texas Crim. Rep. 58; Smith v. State, 104 Texas Crim. Rep. 616. For aught this court knows from the bills or the record the trial court may have refused said charges because he did not think any such argument had been made. Nor do we find in any of said bills any showing of facts or circumstances surrounding or leading up to or connected with such argument, if made. Moore v. State, 107 Texas Crim. Rep. 287.

In his motion for new trial appellant set up that juror Cornelius was unfair and had expressed an opinion prior to the trial that appellant ought to be hung. Upon the hearing of this motion the court heard two witnesses. J. W. Long swore that a few days after this homicide he and juror Cornelius were talking of same and Cornelius said Gatlin ought to be hung. Witness said he was working at a feed store at the time, and after the trial he told a brother-in-law of appellant of this conversation. On cross-examination the witness admitted he could not recall what else, if anything, Cornelius said in this conversation, or what he, witness, said. Cornelius took the stand and emphatically denied having

made any such statement and affirmed that when taken as a juror he had no opinion of appellant's guilt. In this condition of the record the trial judge overruled the motion and we think was within his discretion in so doing. For this court or the trial court to hold that in case a man could be found to affirm that a member of a jury had said to him that the accused was guilty,—and this affirmation be in terms denied by the juror, and there be but these two witnesses before the trial court, that in such case the court below would be wrong in deciding that the unfairness of the juror had not been shown,—would be setting a most dangerous precedent, and one to which we are unwilling to give our sanction.

The charge given in this case seems eminently fair and full; in fact we find therein matters deemed by us to be more favorable to appellant than the law entitles him to. The State witnesses make out a case of murder under circumstances showing deliberation and absence of emotion, excitement or other circumstances which might show a murder without malice aforethought. The jury heard all the details of the treatment of the wife of deceased, appellant's daughter, as claimed by the defense, and after considering the evidence under the favorable charges above referred to, they have returned a verdict against appellant. We have considered the other matters in the record not briefed and are of opinion that no error appears in any of them.

The judgment will be affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—Complaint of the court's refusal of special instructions relating to remarks of State's counsel is made in many bills of exceptions, each of which is sufficient to show that the remarks were in fact made and that they were made the subject of objection and exception. Intimation to the contrary in the original opinion is withdrawn. In stating the facts on which the demand for special charges was based, the bills are meagre. In the absence of some information in the bills of exceptions showing the connection of the remarks of which complaint is made with the surrounding circumstances, the presumption in favor of the correctness of the court's ruling will prevail against the bills. See Gonzales v. State, 88 Tex. Cr. R. 248; Greenwood v. State, 99 Tex. Cr. R. 160; Moore v. State, 107 Tex. Cr. R. 288. We have, however, considered the bills on their merits.

The discussion of the bills of exceptions of which treatment is made in detail in the original opinion will not receive further attention in this opinion.

By special charges given at the request of the appellant, the jury was instructed to disregard each of the following remarks of State's counsel:

"They just had him testify to this self-defense so the Court would have to charge on it. Judge Taylor knows it that there is no self-defense in this case."

"Gentlemen, you are charged not to consider the argument of the private prosecutor, J. V. Allred, wherein he said the special charge that was given was the defendant's charge."

"Why didn't they put Virgil on the stand? I know all right but am not privileged to tell you."

"Thirteen years ago the defendant had to give up his wife and baby because he could not live with his wife."

"The defendant was kept in jail after he had been refused bond, while we were trying to find the facts of this case."

The remarks to which the special charges refused were addressed are as follows:

"Gentlemen of the Jury, this little girl was enriched by thousands or hundreds of dollars, by collecting the insurance on her dead husband."

"He didn't tell you about the word for word conversation that Clarence Good—no Judge Taylor, the defendant's dollars are jingling in your pockets to create sympathy you have for the father and mother of the dead boy."

"As I heard Mr. Clarence Good unfold this story of bloody murder—and that the counsel for the defense with his change jingling in their pockets to get a Young County jury to turn him loose on the country to kill somebody else tomorrow."

"Judge Taylor, you have a lot of sympathy for this boy's father and mother. Your sympathy is where the dollar is, on the side of the defendant that is jingling now in your pockets."

"Mr. Clanahan, weren't you surprised it wasn't a hip pocket movement as usual in self-defense cases instead of hitting him with a piece of cloth? Its the old story overworked, self-defense."

"Those bloody facts and that bloody enterprise over there that day with blood dripping from his fingers and the blood of his fellow man on his hands, he asks mercy at your hands."

"Aren't you getting tired of this tommy rot of self-defense with murder stalking about the country every day."

Bonnie Miles, wife of the deceased and daughter of the appellant, (the little girl to which reference is made in one of the instructions) was a witness for the appellant and gave damaging testimony against the State. She was the beneficiary in an insurance policy upon the life of the deceased, which policy was collected soon after the death of the deceased and the proceeds, at least in part, were in possession of the witness at the time of the trial.

Taking note of the testimony of the witness, Clarence Goode, and of the appellant's own testimony, it cannot be justly said that there was no basis in evidence for the remarks of counsel referring to the story of Goode and using the figure of speech touching the "dripping blood." It would seem to treat the intelligence and judgment of the jury but lightly to attribute the verdict to the remarks mentioned rather than to the subject of the remarks as contained in the testimony to which reference is made above. In that connection, it may be said that the evidence on the issue of self-defense, even as it comes from the lips of the accused, was doubtless regarded as far more persuasive against that contention than the argument to which reference is made.

The reference to the influence upon counsel for the defendant upon the trial of the money he had received for his fee, while good taste would have suggested its omission, it is conceived that it rendered the argument either more ornate or forceful. Appellant's counsel was not his witness; nor was it discrediting nor unusual that skilled and experienced as was counsel for the accused, he was to be paid for his services in representing his client.

The immediate occurrences of the homicide, as detailed by the witness Goode, are in substance as follows: Oscar Miles was sitting in a tailor shop at work upon a garment when the appellant entered. Miles arose and said, "Good morning." Appellant said: "Where is Deacon?" Miles replied, "He's stepped out." Deacon was a boy, an employee of the tailor shop and son of the witness Goode. The witness said, "Here I am, Mr. Gatlin." Miles said, "Here's his father; don't you know him?" Gatlin said, "Yes, sir; I know him." Miles held out his hand to Gatlin, who said, "You know what you've done," and fired into the body of Miles. Miles was unarmed and had nothing in his hand. He said nothing and made no motion before the first shot was fired other than to extend his hand of greetings. When the first shot was fired Miles went right down and crawled under the table. "His legs showed here and

his head on this side, going under the table." While in that position, Gatlin stepped up one step and shot. He shot under the table four times. He shot Miles under the table. Miles had nothing in his hand as he approached Mr. Gatlin. He was in his shirt sleeves.

Upon the body of the deceased there were three wounds in the back and one in the front. That in the front entered near the left nipple. Those in the back entered near the spinal column.

From the testimony of the appellant the following is quoted:

"When I fired the first shot Mr. Miles was about as far from me as you gentlemen are right there; as well as I could remember, some 8 or 10 or 12 feet. As to whether there had been anything said between us, by either myself or Mrs. Miles, except when he was coming towards me, and what I said to him, I says, 'Hold on there,' and pointed my finger. I said, 'You know what you've done and said,' and he didn't any more halt or wait until he started to raise his hand up,—when he did I shot. As to whether when I pointed my finger at him and said, 'Hold on there,' he stopped, he had kinda halted and raised his hand. I had the gun in my right hand. As to when I took that gun out with reference to the time I shot, it was just as he halted; it looked like he raised that hand, then I took out my gun and shot immediately as I raised it. I shot six times in all. After the first shot Mr. Miles fell just as completely back as a man could fall; he couldn't have fell any straighter back if you had taken a board and pushed him over; he fell over and rolled there right under the counter, and was reaching or grabbing with his hands. He rolled under this counter or table or something like that. I continued to shoot. I shot two or three times before he rolled under the table, once before he rolled completely under the table. I shot a couple of times after he rolled completely under the table, I think. At the time I fired this first shot and all the rest of them, I believed I was in danger at the hands of Mr. Miles of losing my life or inflicting serious bodily injury to me."

According to the witness Goode, the deceased was working on a coat when the appellant came in. After he was killed, the scissors and a ripping knife were on the chair with the coat where deceased placed them before he arose to greet the appellant. There was but one pair of scissors or shears in the building. Miles had nothing in his hand, and at the time he was shot his hand was by his side.

It is the duty of this court, and the due and proper administration of justice demands that not the words alone shall control but in estimating the argument of which there is complaint upon appeal

the nature of the offense, the evidence adduced and the verdict rendered are essential elements. It has often been stated, as it was in Vineyard's case, 96 Tex. Cr. R. 404, that:

"We think the only safe rule to be that this court should not hold an argument to be reversible error unless it is in extreme cases where the language complained of is manifestly improper, harmful and prejudicial, or where a mandatory provision of the statute is violated, or some new and harmful fact injected into the case. Stanchel v. State, 89 Tex. Crim. Rep. 358, 231 S. W. Rep. 120; Henderson v. State, 76 Tex. Cr. R. 66, 172 S. W. Rep. 793; Bowlin v. State, 93 Tex. Crim. Rep. 452."

Tested by the principle stated above and announced in various precedents, the court feels justified in stating that it finds nothing in the remarks of counsel which were withdrawn of a nature so harmful that the instructions from the court mentioned would preclude the thought of possible injury to the accused.

Touching the remarks embraced in the special charges that were not given to the jury, as the matter is presented in the several bills of exceptions, the view is entertained that they contain nothing which would warrant this court, upon the record before it, in annulling the verdict of the jury.

By direct and cogent evidence the verdict of the jury is supported. It is the effect of the jury's finding that the appellant was guilty of murder with malice aforethought. It was within the discretion of the jury to fix the penalty at death or confinement in the penitentiary for any term of years not less than two. They assessed against him far less than the maximum penalty. In ruling upon the admission and rejection of the evidence, as pointed out in the original opinion, there were no errors committed. In submitting the case to the jury, the charge of the court was comprehensive and liberal to the accused. There is nothing in the record which leads this court to conclude that the verdict of the jury was the result of passion or prejudice engendered by the argument of counsel for the State. On the contrary, the verdict is regarded as reflecting the judgment of the jury in response to the evidence adduced upon the trial, giving full effect to the mitigating circumstances by which the appellant claims his mind was affected.

The motion for rehearing is overruled.

*Overruled.*